1C8HMERH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   RICHARD MERINO, individually
    and on behalf of all others
4   similarly situated,

5                    Plaintiffs,        New York, N.Y.

6           v.                          10 Civ. 706 (JSR)

7   BEVERAGE PLUS AMERICA CORP.,
    et al.,
8
                    Defendants.
9
    ------------------------------x
10
                                        December 8, 2011
11                                      10:05 a.m.

12  Before:

13                   HON. RONALD L. ELLIS,

14                                      Magistrate Judge

15                   APPEARANCES

16  SCOTT MICHELS
    MAIA GOODELL
17      Attorneys for Plaintiffs

18
    YUN C. CHO
19  YUN S. CHO
        Defendants Pro se
20
    ALSO PRESENT:
21  Selma Marks, Interpreter

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1C8HMERH

```
1        (In open court)

2        THE DEPUTY CLERK:  In the matter of Richard Merino,

3   individually and on behalf of all others similarly situated v.

4   Beverage Plus America Corporation, et al.

5        All counsel please identify yourselves for the record.

6        MR. MICHELS:  Scott Michels and Maia Goodell for the

7   plaintiffs, from Vladeck Waldman.

8        We have six of the plaintiffs with us.  Mr. Primitivo

9   Aguilar, Colin Morales, Bernardo Vazquez Herrera, Jesus

10  Mantilla, Jorge Paes, and Richard Merino.

11       THE COURT:  Good morning.

12       MR. MICHELS:  Good morning.

13       THE DEPUTY CLERK:  Defendants please stand and enter

14  your appearance for the record.

15       MR. YUN C. CHO:  Good morning, your Honor.  My name is

16  Yun C. Cho.  I am a defendant, individual pro se.

17       MR. YUN S. CHO:  Good morning, your Honor.  My name is

18  Yun S. Cho.  I am a defendant.

19       THE COURT:  Thank you.

20       This proceeding is for the purpose of consideration of

21  damages in the case.  I have a number of questions.  I don't

22  have any set procedure.  I do want to make sure that all the

23  issues concerning what are the appropriate damages, how they

24  should be calculated, each party gets an opportunity to weigh

25  in on.
```

1          My first question concerns the second supplemental

2     affirmation that we received yesterday.  Just so that I will

3     know where it fits in with what was already submitted, I would

4     like plaintiffs to explain to me what this does or how this

5     changes what was submitted before, what it adds to it.  So that

6     way when we consider it, we will know exactly how to consider

7     it.

8          MR. MICHELS:  Certainly, your Honor.  What this does

9     is to submit different copies of Exhibits 13 through 23 of the

10    previous affirmation of Ms. Goodell.  We added footnotes with

11    citations to the record to the new exhibits in the hopes that

12    our basis for our damages calculations would be a little bit

13    more clear.  I believe we corrected a mathematical error on one

14    of our calculations of damages for Mr. Paes.

15         THE COURT:  So did this result in a different number

16    for the request?

17         MR. MICHELS:  It does, your Honor.

18         THE COURT:  What is the request as you now understand

19    it to be?

20         MR. MICHELS:  It is 1.694 -- sorry.  1,694,475.

21         THE INTERPRETER:  Excuse me.  Can you repeat the

22    amount?

23         MR. MICHELS:  1,694,475.

24         THE COURT:  And so what is the breakdown of the

25    elements of that number?

1C8HMERH

1          MR. MICHELS:  We have calculated damages under the

2    Fair Labor Standards Act and the New York Labor Law for all of

3    the named and opt-in plaintiffs.  We have also calculated a

4    separate amount of damages for the other class members under

5    the labor law, and we have also requested damages, compensatory

6    damages and punitive damages, for Mr. Merino for retaliation

7    for his termination.

8          THE COURT:  So the only request for compensatory and

9    punitives has to do with Mr. Merino.

10          MR. MICHELS:  Is for Mr. Merino, that's correct.

11          THE COURT:  In Exhibit, I guess it would be 15A, you

12    have -- do you have 15A?

13          MR. MICHELS:  Yes, your Honor.

14          THE COURT:  That has several numbers on it, one of

15    which is 883,992.  What does that number represent?

16          MR. MICHELS:  That represents the total damages under

17    the labor law, including liquidated damages for the members of

18    the class, excluding the damages for the named and opt-in

19    plaintiffs.

20          THE INTERPRETER:  Excluding what?

21          MR. MICHELS:  The damages for the named and opt-in

22    plaintiffs.

23          THE COURT:  And so the damages for the named and

24    opt-in plaintiffs, what exhibit is that on?

25          MR. MICHELS:  They are on separate exhibits.

1C8HMERH

```
 1            THE COURT:  You have to add them up?

 2            MR. MICHELS:  That's correct.

 3            THE COURT:  So which ones do you have to add up?

 4            MR. MICHELS:  Well, it would be the labor law damages

 5    in Exhibit 16A through 23A.

 6            THE COURT:  So on 15A where you say or where you

 7    indicate minus 122,000, that number represents what?

 8            MR. MICHELS:  That number represents the labor law

 9    damages excluding liquidated damages that are due to the named

10    and opt-in plaintiffs.

11            THE COURT:  New York Labor Law damages?

12            MR. MICHELS:  Correct.

13            THE COURT:  So presumably those damages would be

14    reflected in 16A to 23A?

15            MR. MICHELS:  Correct, your Honor.

16            THE COURT:  As to your methodology in calculating

17    damages, you don't have client records.

18            MR. MICHELS:  That is right, your Honor.

19            THE COURT:  But you do believe you have enough records

20    to determine what was the number of hours that a typical class

21    member worked.

22            MR. MICHELS:  We do, your Honor.  Looking at Exhibit

23    13A, it is a summary of the documents provided by defendants

24    that show the hours worked by at least some of the class

25    members, and what we have done is take the average number of
```

1C8HMERH

1    hours worked per day for all of the employees for whom the

2    defendants produced documents, which comes out to about 10.35

3    hours per day on average.

4              THE INTERPRETER:  How many, please?

5              MR. MICHELS:  10.35 hours per day on average.

6              We believe that we have enough records to indicate

7    that is a reasonably accurate number and it is also in line

8    with the affirmations from the plaintiffs and it is also in

9    line with some of the deposition testimony from the defendants.

10             THE COURT:  And as to the plaintiffs who you did the

11   calculations for, the number of hours for them is based in part

12   on their affirmation?

13             MR. MICHELS:  That is correct, your Honor.

14             THE COURT:  Did the defendants ever challenge that?

15             MR. MICHELS:  I don't believe that they did.  They

16   have challenged our calculation of damages, but it appears that

17   their argument is merely that they paid overtime wages and

18   spread-of-hours wages and that was incorporated into the weekly

19   salaries that the plaintiffs earned.  But I don't believe that

20   they have challenged our methodology for finding the average

21   number of hours per day.

22             THE COURT:  Before we continue with you, let me ask

23   one of the Mr. Chos --

24             MR. YUN S. CHO:  Yes, sir.

25             THE COURT:  -- do you understand that part of the

1C8HMERH

1  calculation here has to do with the average number of hours

2  that the plaintiffs worked?

3          MR. YUN S. CHO:  Yes, I understand, your Honor.  They

4  actually calculated it based upon the document I presented,

5  personnel record and a copy of time punching cards that I

6  supplied.  But their mistake was when they calculated based

7  upon my personnel record, they could see how much I paid, and

8  also I wrote down those minimum wages overtimes.  The figures

9  are there.

10         The only reason I paid a fixed amount is because all

11 the employee work -- they asked me to pay fixed amount.  Since

12 our beverage business is very -- working hours are different,

13 like compared summer to winter.  When winter comes, the working

14 hours going to get about 10 to 15 hours less than summertime.

15 So when I hired all those employees, I explained the things and

16 I gave them a choice.  If you want a fixed amount or paying by

17 the hour.  They all choose the cash in fixed amount because

18 they have family.  They don't want to have fluctuating income,

19 I believe.

20         THE COURT:  OK.  Before you continue with that, as to

21 the question of how many hours they worked, do you have any

22 evidence to refute the proposition that the average number of

23 hours was 10.35 hours per day?

24         MR. YUN S. CHO:  No; they just presume that the

25 average working hours is 10.3 hours a day, but actually it's

1C8HMERH

1    not.

2              THE COURT:  What do you have that shows that there was

3    a different number of hours worked per day?  Do you have any

4    records?

5              MR. YUN S. CHO:  I do, your Honor.  On personnel

6    record there is a time I wrote down, and also I had a punch

7    card.  Actually, I wanted to know each exactly hours, I want to

8    know exactly how much hours they work on days.  So I have about

9    eight months' time punching cards that they worked.

10             THE COURT:  You gave this to the plaintiffs?

11             MR. YUN S. CHO:  Yes, sir.

12             THE COURT:  Do you know what he is talking about?

13             MR. MICHELS:  I do, your Honor.  I believe that they

14   are included as Exhibit 12 to Ms. Goodell's original

15   affirmation dated October 14th.  What we had done, essentially,

16   is to take the information in those documents and to put them

17   into a spreadsheet that you see here on Exhibit 13A.

18             THE COURT:  Mr. Cho, you have seen these exhibits,

19   haven't you?

20             MR. YUN S. CHO:  Yes, your Honor.  It shows all the

21   overtimes and spread hours there, your Honor.

22             THE COURT:  So what is wrong with it?

23             MR. YUN S. CHO:  I don't know.  I don't know why they

24   start with this claim in the first place.

25             THE COURT:  OK.  First of all, Mr. Cho, we are not

1C8HMERH

 1    here to relitigate any of the issues about liability.  We are

 2    here on a question of damages.

 3            The first question I have is, the plaintiffs say that

 4    the average workday was 10.35 hours.  My simple question to you

 5    is this.  Do you have any evidence to refute the assertion that

 6    the average number of hours worked was 10.35?  Do you have any

 7    documents?  If you have some documents, you can try to enter

 8    them into evidence and we will consider them.

 9            MR. YUN S. CHO:  It shows on the personnel records,

10    your Honor.

11            THE COURT:  What shows on the personnel records?

12            MR. YUN S. CHO:  Exhibit 4 and numbers D, E, F, there

13    is a personnel record that shows how many hours he worked

14    during that season.

15            THE COURT:  I am not sure what Exhibit 4 you are

16    referring to.

17            MR. YUN S. CHO:  Plaintiffs' motion for damages and

18    class notice, your Honor.  The filing before this one.

19            THE COURT:  What does that show in terms of the number

20    of hours worked?

21            MR. YUN S. CHO:  Including overtime, 56 hours he

22    worked.  It shows the 40 hours plus 1.5, one and a half.  So

23    eight hours of overtime.

24            THE COURT:  Do you know which document he is referring

25    to?

1C8HMERH

```
 1              MR. MICHELS:  Yes, your Honor.  If you look at Exhibit
 2   12 to Ms. Goodell's original affirmation, on Defendants' 4, at
 3   the bottom under remarks, I believe there are the numbers that
 4   Mr. Cho is talking about.  But the numbers that he is referring
 5   to here, it is our understanding that this is Mr. Cho's
 6   notation and his calculation of the hourly rate.  But our
 7   estimate of 10.35 hours a day is based on the actual time
 8   sheets where plaintiffs clocked in and out everyday.  You can
 9   see them, for example, on Defendants' 16.
10              THE COURT:  On Defendants' 16?
11              MR. MICHELS:  Yes.  It is Exhibit 12, Defendants' 16.
12              THE COURT:  OK.
13              MR. MICHELS:  This is one sample.  So our calculation
14   of the hours per day are based on the time punch sheets.
15              What Mr. Cho is discussing is, first of all, hearsay
16   because it is his own sort of writing on the document; and
17   second of all, it is unreliable because what this is is what he
18   claims --
19              THE COURT:  Let me make sure I understand.  You have
20   the time sheets which they actually punched in and out?
21              MR. MICHELS:  For part of the time that plaintiffs
22   worked there, yes.
23              THE COURT:  Are there any samples where I could look
24   at an example, such as Defendants' 16, and compare it to the
25   remarks or notes that Mr. Cho made?  I take it they don't agree
```

1C8HMERH

1    with you.

2            MR. MICHELS:  Yes.  That is correct, your Honor.

3            THE COURT:  Mr. Cho, you made these remarks in the

4    personnel records?

5            MR. YUN S. CHO:  I beg your pardon, your Honor?

6            THE COURT:  These are the actual personnel records?

7            MR. YUN S. CHO:  Yes, your Honor, because this

8    notation was before I start clocking in my employees.  So I had

9    to make sure that I have how many hours they worked and

10   overtime how many hours they worked.

11           THE COURT:  My question then is, are there any

12   examples -- so you are saying that these are two separate time

13   periods?

14           MR. YUN S. CHO:  Yes, sir.

15           THE COURT:  The time period of you making the remarks

16   and the time period when they are punching in.

17           MR. YUN S. CHO:  When I start clocking the employees,

18   then I don't have to write down on the personnel record how

19   many hours they worked because the time sheet shows how many

20   hours they worked.

21           THE COURT:  Is that correct, counsel?

22           MR. MICHELS:  I'm sorry.  Which part?

23           THE COURT:  If I understand correctly, and I

24   understand you are raising questions about whether it is

25   hearsay, self-serving or whatever, but Mr. Cho says that we

1C8HMERH

```
 1   have two kinds of records.  One is the ones in which he made

 2   remarks, in which he indicates what the time was, and then you

 3   have the time records where they punch in and punch out, which

 4   presumably the machine indicates the time.

 5          MR. MICHELS:  Yes.  I mean, that's correct, your

 6   Honor.  I'm not sure, actually, if Mr. Cho wrote down these

 7   remarks during the period during which the plaintiffs clocked

 8   in and out.  I mean it appears that, based on Exhibit 12,

 9   Defendants' 1, for example, which is the personnel record for

10   Richard Merino, that he did write these remarks during at least

11   some of the time when the plaintiffs used the time card.

12          THE COURT:  OK.  I understand to the extent that you

13   have actual time clock entries you can see what the number of

14   hours were.  The time clock entries start when?

15          MR. MICHELS:  I believe that they run for a period

16   in --

17          THE COURT:  When do they start?

18          MR. MICHELS:  I believe, your Honor, it is June 2008.

19          THE COURT:  It is your assumption that the number of

20   hours were consistent before the time clock started?

21          MR. MICHELS:  Yes.  Yes, your Honor.

22          THE COURT:  And it is your assertion, Mr. Cho, that

23   the records that you have that are handwritten are the correct

24   indication of the time that was worked?

25          MR. YUN S. CHO:  Yes, your Honor.
```

1C8HMERH

1    THE COURT:  Counsel, do you also have testimony from

2    the plaintiffs about whether or not there was any variation in

3    the time between the pre-time clock and after the time clock in

4    terms of how they worked?

5    MR. MICHELS:  Yes.  I believe that their testimony is

6    that they worked a consistent number of hours during the entire

7    period of employment.  Also, if you look again at Defendants'

8    1, Exhibit 12, under the remarks, even if we were to consider

9    these, they appear to show up around 50 hours of work per week,

10   which is consistent with the time punch cards and consistent

11   with plaintiffs' testimony.

12   THE COURT:  It shows more than 50 hours.

13   MR. MICHELS:  It does.  My understanding is that this

14   is purportedly a calculation that includes overtime and spread

15   of hours.  In other words, it includes time and a half.

16   THE COURT:  Mr. Cho, when are you alleging that these

17   entries were made, the remarks?  Are you saying they are

18   contemporaneously?

19   MR. YUN S. CHO:  It was between July 15, 2008 to

20   January 16, '09.  A six-month period.

21   THE COURT:  You mean that you made these remarks?

22   MR. YUN S. CHO:  Yes, your Honor.

23   THE COURT:  Isn't that when the time clocks were being

24   used?

25   MR. YUN S. CHO:  No, your Honor.

1C8HMERH

1          THE COURT:  When did the time clock start?

2          MR. MICHELS:  Your Honor, I believe that we have time

3     card records, at least for Mr. Merino, during that period, July

4     2008 until early 2009.

5          MR. YUN S. CHO:  Your Honor, the remark I put on my

6     personnel records, based on these time cards, when I try this

7     time clocking, I wrote down the total hours.

8          THE COURT:  And why were you making these remarks?

9          MR. YUN S. CHO:  Because at the time nobody wants by

10    paying an hour either.  I ask many times.  So I need to know

11    how many hours they worked.  So I didn't calculate each time

12    sheet because it wasn't necessary.  So I just put a note on my

13    personnel record how many hours individual to pay.

14         THE COURT:  So is it your assertion that there was not

15    10.35 hours of overtime?

16         MR. YUN S. CHO:  No.  I think it is less than that

17    because wintertime is really slow time of year.  Sometimes they

18    work less than 40 hours a week.

19         THE COURT:  And do you have any evidence, any

20    documentary evidence, which shows anybody working less than 40

21    hours a week or less than 50 hours a week?

22         MR. YUN S. CHO:  I think so, your Honor.  The copy of

23    the time card I provide to plaintiffs' counsel, there is

24    December and January time sheets.  If they can calculate, it is

25    a lot less than summertime.  It is right here, your Honor.

1C8HMERH

1      THE COURT:  Some of the time sheets that defendants

2 did produce, did they cover, quote-unquote, the winter months?

3      MR. MICHELS:  They did, your Honor.

4      THE COURT:  Any apparent pattern there?

5      MR. MICHELS:  I mean, I believe that that is correct,

6 that the plaintiffs worked somewhat fewer hours during the

7 winter months than they did during the summer months.  But our

8 calculation of 10.35 is an average that includes records for

9 both summer and winter, and the testimony from the plaintiffs

10 is that they worked quite a bit longer than ten hours a day,

11 often 12 hours a day during the summer.  I believe Mr. Cho in

12 his deposition confirmed that, at least as to the summer

13 months.

14      MR. YUN S. CHO:  Also summertime employee also clocked

15 in.  So at least this time card shows exact hours they worked,

16 even though they think they work longer hours, but actually

17 it's not.

18      THE COURT:  Well, the plaintiffs are relying on the

19 time cards, though.

20      MR. YUN S. CHO:  What they produce with 10.35 hours a

21 week, I just receive today, your Honor.  I'm not sure this is

22 right, how they can calculate that.  I don't have the time to

23 review, your Honor.

24      THE COURT:  When you say you just received it today,

25 are you saying you didn't receive the plaintiffs' original

1C8HMERH

1    submission?

2          MR. YUN S. CHO:  The amended one I didn't, your Honor.

3    Yesterday.

4          THE COURT:  I understand yesterday, but before that

5    the plaintiffs had already made a submission in which they

6    indicated the number of hours of overtime was 10.35.  Are you

7    saying you did not get the earlier submission?

8          MR. YUN S. CHO:  Maybe I was confused, your Honor.

9          THE COURT:  That would have been sometime in October,

10   middle of October.

11         While you are thinking about that, I do see that the

12   first issue is whether or not 10.35 is a reasonable number

13   given the lack of total records.  From the defendants' point of

14   view, you do understand that if you don't have any evidence to

15   refute the 10.35 hours, then the calculations based on that

16   will be objectively reasonable?

17         The plaintiffs have testified, according to counsel,

18   that they worked pretty much the same number of hours during

19   the period of time that is at issue and that the time cards

20   that do exist show that is an average of 10.35 hours.  That

21   seems pretty straightforward.  To the extent that you want me

22   to consider some other number, I would have to have some

23   objective evidence other than you just saying they worked less.

24   If you don't have anything, then you can expect that I will

25   find that 10.35 hours seems to be a reasonable calculation

1C8HMERH

1    based on the lack of additional records.

2              MR. YUN S. CHO:  Your Honor, I don't have any

3    objection how many hours actually they worked.  It is the

4    working hours -- if they argue with all the employees worked

5    average 10.35 hours, it's fine.  The thing is I paid

6    accordingly all 10.3 hours per day when they work, I paid

7    fully, including overtimes, your Honor.  I have records shows

8    how many hours they worked so how much money I supposed to pay.

9    But since they ask for a fixed amount, that is the way I did

10   it, which means wintertime they overpaid, but they don't say

11   anything about that.

12             THE COURT:  I understand the argument you are making.

13   I just don't have any particular evidence about it.  You did

14   not submit any affidavits or affirmations in opposition to the

15   plaintiff, as I recall.  You made some statements.  You didn't

16   submit an affidavit in which you challenged the 10.35 hours,

17   did you?

18             MR. YUN S. CHO:  No, your Honor, because we paid --

19   I'm sorry, your Honor.  Because as I mentioned before, I paid

20   all the money I suppose to pay for that 10.35 hours.

21             THE COURT:  All right.  That is certainly one of the

22   pivotal questions the court has to answer, what is the number

23   of hours worked.  It seems to me these calculations is all we

24   have.

25             MR. MICHELS:  That is correct, your Honor.

1C8HMERH

```
 1              THE COURT:  So as regards that issue, as I said,

 2   Mr. Cho, unless there is some objective evidence indicating

 3   that the 10.35 is not reasonable, given the lack of records,

 4   then the use of that number seems to be justified.  You should

 5   keep that in mind as we proceed through this.

 6              Now the other elements that you have, I guess there is

 7   a question of willfulness.

 8              MR. MICHELS:  That is correct, your Honor.

 9              THE COURT:  You want me to presume willfulness?

10              MR. MICHELS:  Yes.

11              THE COURT:  What do you want me to consider in that

12   presumption?

13              MR. MICHELS:  The standard is that the defendants

14   acted willfully if they knew that what they were doing was

15   wrong or whether they acted with reckless disregard for the

16   law.

17              First of all, the fact that the defendants have

18   defaulted in this case --

19              THE INTERPRETER:  Excuse me?

20              MR. MICHELS:  The fact that the defendants have

21   defaulted in the case we believe should entitle us to a

22   presumption of willfulness.  Regardless of that, the defendants

23   in their depositions testified that they were aware at all

24   times of their obligation to pay overtime and spread-of-hours

25   wages.  We have established at this point that they have not
```

1    done so and I don't believe that there is any evidence to show

2    that they made a good faith attempt to pay in compliance with

3    the law.

4             THE COURT:  So as to the facts, which they are bound

5    by on the default, one fact that they are bound by is they knew

6    they were supposed to pay and, two, because of the default that

7    they did in fact not pay the correct amount.

8             MR. MICHELS:  That's correct, your Honor.

9             THE COURT:  So I understand the calculations you did

10   with respect to the plaintiffs and the opt-ins, and you assume

11   that that was the same for those who we haven't identified yet

12   or have not come forward yet.

13            MR. MICHELS:  In terms of the hours worked.

14            THE COURT:  Yes.

15            MR. MICHELS:  Yes, that's right.

16            THE COURT:  And you want me to make a finding on

17   damages assuming that the number of class members which you

18   have identified all worked that same number of hours.

19            MR. MICHELS:  Well, they worked the same average

20   number of hours per day.  Correct.

21            THE COURT:  What evidence do you have of that, or are

22   we just going to presume that based upon the fact that --

23   should I assume that every class member worked the same as the

24   ones you do know?

25            MR. MICHELS:  I mean, that presumption is based on the

1C8HMERH

| | |
|---|---|
| 1 | fact that the named and opt-in plaintiffs generally worked the |
| 2 | same number of hours per day.  Not exactly, but very close, and |
| 3 | the fact that we don't have evidence to suggest a different |
| 4 | number of hours for the unknown class members. |
| 5 | We do, actually, your Honor, have -- I should correct |
| 6 | that statement.  We do have some time cards for the potential |
| 7 | class members who are not named plaintiffs that were produced |
| 8 | by defendants that were included in our calculation of 10.35 |
| 9 | hours. |
| 10 | THE COURT:  And they are consistent with the |
| 11 | assumption that everybody worked the same number of hours? |
| 12 | MR. MICHELS:  Yes, your Honor. |
| 13 | THE COURT:  Do you understand, Mr. Cho? |
| 14 | MR. YUN S. CHO:  Yes, your Honor. |
| 15 | THE COURT:  Do you have any evidence concerning the |
| 16 | class members who have not opted in concerning their hours?  I |
| 17 | assume you produced all of the records that you do have to the |
| 18 | plaintiff. |
| 19 | MR. YUN S. CHO:  No, your Honor.  Once in a while |
| 20 | somebody gets home early, somebody gets late because of |
| 21 | traffic, but it doesn't happen much.  So I guess they worked |
| 22 | about the same hours. |
| 23 | THE COURT:  Counsel, assuming that I agree with you |
| 24 | and you do calculations based upon all of the class members and |
| 25 | you come to this number that you have proposed, are you going |

1C8HMERH

 1    to send notice requirement to show up and claim their prize, so

 2    to speak?

 3              MR. MICHELS:  Ms. Goodell is going to address this.

 4              MS. GOODELL:  Your Honor, with your permission I will

 5    address the class issues.

 6              THE COURT:  OK.

 7              MS. GOODELL:  Yes, your Honor.  We have attached a

 8    form of proposed notice to be mailed to those class members

 9    whose mailing address or last-known mailing address can be

10    ascertained -- that is Appendix A to our brief -- as well as a

11    proposed notice to post in a newspaper and in the neighborhood.

12    We would also ask the court to order that defendant post it at

13    their workplace.  And we will obviously do our best to identify

14    as many class members as possible.

15              THE COURT:  What do you propose to do if they don't

16    come forward?

17              MS. GOODELL:  If they don't come forward, we will

18    apply to the court for a cy pres distribution.

19              THE COURT:  What is it that you are suggesting the

20    court do, that defendants pay some money into some kind of an

21    account?

22              MS. GOODELL:  I think that would probably be the

23    easiest, would be to pay it into an escrow account, and we

24    would distribute as much as we can.  Then what we are proposing

25    is that after a period of four months from that payment

1C8HMERH

```
1    anything that has not been distributed we would apply for a
2    distribution.
3              THE COURT:  Do you think that the defendants should
4    have an opportunity to contest anyone who comes forward?
5              MS. GOODELL:  We have proposed that they provide an
6    opt-in notice with dates.
7              THE COURT:  I understand.
8              MS. GOODELL:  I think at this point that defendants
9    have produced all of the records that they claim they have, so
10   I'm not sure what they would contest it with.
11             THE COURT:  That is a different issue.  How would they
12   contest it.  The question is should they have a right to
13   contest.
14             I don't know what evidence they have or may have or
15   who is going to come forward.  Someone may come forward and
16   they may say we remember this person and they will say this
17   person wasn't even there.  The real question is from the point
18   of view of their due process rights, what they are entitled to.
19   The default doesn't mean that you get to pay damages regardless
20   of what happens.  Do you have a proposed or suggested
21   mechanism?  Of course we could say that there is a presumption
22   and then the defendants could indicate whether or not they
23   intend to challenge and what their challenge is.  If they don't
24   have any evidence, then --
25             MS. GOODELL:  Your Honor, that would be one way to do
```

1C8HMERH

```
 1    it.  I do think that in this case, because it is actually
 2    undisputed that the number of workers at a given time was
 3    fairly ascertainable, so there were about six to eight workers
 4    at any given time and that is what our calculation is based on,
 5    the total amount of damages is a different question than the
 6    question of sort of who would be in the class.  So we think it
 7    is appropriate to order them to pay the total amount of
 8    damages.
 9         If they want to contest how that gets divided up,
10    whether a particular class member is entitled to as much of the
11    pie as they are claiming, I don't think that we would have a
12    huge objection to that.  We would argue that at this point it
13    has been years in this litigation.  They have come forward with
14    all the documents they have come forward with.  We have used
15    them all.  Their right to sort of come up with new records at
16    this stage of the litigation we would argue is not appropriate.
17         THE COURT:  And what about your suggestion, proposal
18    for cy pres distribution?  To the extent that a class member
19    doesn't come forward and doesn't request damages, since damages
20    are not presumed even with the default, why should the
21    defendant pay damages to somebody who hasn't come forward?
22    Well, not pay it to them, but lose the benefit of it.
23         MS. GOODELL:  Your Honor, the Second Circuit Masters
24    case, which is cited in our brief at page 25, specifically
25    approves a distribution like that, particularly in a case like
```

1C8HMERH

```
 1    this where the class is difficult to ascertain because the
 2    workers are transient, many work for a short period of time.
 3    That shouldn't give defendant the right to be off the hook for
 4    not paying overtime.  It is really undisputed that they had
 5    this number of workers who worked this number of hours and they
 6    didn't pay them overtime.
 7              THE COURT:  Do you have anything to say, Mr. Cho?
 8              MR. YUN S. CHO:  Yes, your Honor.  When I start
 9    business in 2004, I had only two trucks.  I had only four
10    employees at that time.  The plaintiffs' counsel just argued
11    that after I grow my business to four trucks, they are basing
12    it on that activity when we were kind of busier than before.
13              THE COURT:  So you are saying you didn't have six to
14    eight employees.
15              MR. YUN S. CHO:  No, your Honor.
16              THE COURT:  Do you have any evidence of the number of
17    employees that you had during the whole period of time?
18              MR. YUN S. CHO:  I don't have, your Honor.
19              THE COURT:  OK.  Again, you understand, Mr. Cho, to
20    the extent that you don't have any evidence and you don't have
21    any records, then what we have is the testimony of the
22    plaintiffs and the records that they do have indicating the
23    number of employees.
24              MR. YUN S. CHO:  The one of the plaintiffs, Merino,
25    knows how many workers worked back then.
```

1C8HMERH

1        THE COURT:  Was Mr. Merino deposed?

2        MR. MICHELS:  No, your Honor.

3        THE COURT:  So what evidence do we have about the

4   number of employees during the entire period of time?

5        MR. MICHELS:  We have, first of all, affirmations from

6   the plaintiffs who worked at different periods of time,

7   including one from Mr. Merino.  I'm sorry, your Honor.  I'm

8   just looking for the right paragraph in his affirmation.

9        The affirmation, the plaintiffs have said that they

10  typically had six to eight workers there.  I believe Mr. Cho

11  during his deposition said that he had between five and eight

12  workers on average working as well.

13       THE COURT:  Were those affirmations or any of the

14  testimony specific as to years?

15       MR. MICHELS:  They were specific -- I believe that

16  they were not, your Honor.  They were specific to the time

17  period when each individual and opt-in plaintiffs worked there.

18       THE COURT:  Does that cover the entire period of

19  liability?

20       MR. MICHELS:  I believe that it does, your Honor.

21       THE COURT:  When was Mr. Merino there?

22       MR. MICHELS:  September 2004 until March of 2010.

23       THE COURT:  And he filed an affirmation saying that

24  there were six to eight people during the period of time he was

25  there.

1C8HMERH

1          MR. MICHELS:  His affirmation says that there were up

2     to nine helpers and drivers working at any one time and that he

3     estimated that over 100 people were employed during the six

4     years that he worked there.

5          THE COURT:  What about the attorneys' fees?  You don't

6     have an itemization for attorneys' fees.

7          MR. MICHELS:  We have not submitted it, your Honor.

8     We would propose that at the conclusion of the case to submit

9     an application for fees.

10          THE COURT:  Say that again.

11          MR. MICHELS:  We would propose to submit a fee

12     application.

13          THE COURT:  When?

14          MR. MICHELS:  I mean at any point that your Honor

15     would like us to do it.  Our thought was to wait until the

16     conclusion of the damages proceedings, since we still will be

17     working on the case.

18          THE COURT:  I think the concern I have is if I am

19     going to make a recommendation on damages, the judge would

20     probably want to have a recommendation on the fees also.  But I

21     could be wrong on that.  Certainly that could mean that the

22     judge would allow you supplementation, but just to have

23     something to frame the issues that would be some indication of

24     what the magnitude is so we don't have to do this piecemeal.

25          Since I haven't seen it, I guess I can't comment on

1C8HMERH

1    the fees.  Is there anybody that you want to put on for

2    testimony?

3              MR. MICHELS:  No, your Honor, not unless the court

4    would like to hear it.

5              THE COURT:  I would like to hear from Mr. Merino.

6              Mr. Merino, please come forward and be sworn.

7              There are a number of issues that were raised with

8    respect to Mr. Merino, just so everybody can be put on notice,

9    including the number of employees that were there, the hours

10   that he worked, and any questions that bear on the compensatory

11   damages that he is seeking.  I think to the extent that he is

12   seeking damages other than the pure calculation, the defendants

13   have a right to.

14    RICHARD MERINO,

15        called as a witness by plaintiffs

16        having been duly sworn, testified through an interpreter

17        as follows:

18             THE COURT:  I, of course, would prefer that counsel

19   ask questions, but you understand the issues that I am

20   interested in.  I know he has done an affirmation, but I do

21   want the record to be clear about the issues that we raised,

22   and since he is a live body that we have.

23             MS. GOODELL:  Absolutely, your Honor.  No problem.

24             THE COURT:  You may begin when ready, counsel.

25

1C8HMERH

1   DIRECT EXAMINATION

2   BY MS. GOODELL:

3   Q.  Good morning, Mr. Merino.

4   A.  Good morning.

5   Q.  You worked for defendant Yun S. Cho?

6   A.  Yes, that's right.

7   Q.  When did you first work for Mr. Cho?

8   A.  In September, around September of 2004.

9   Q.  And when did you stop working for Mr. Cho?

10  A.  On March 2010, because he fired me.

11  Q.  During that time, from September 2004 through March 2010,

12  were your hours generally the same or were they different in

13  different years, something else?

14  A.  The same.

15          THE INTERPRETER:  The interpreter corrects herself.

16  A.  Similar.

17  Q.  And what hours did you work?

18  A.  Around eleven hours per day.

19  Q.  What time did you start work in the morning?

20  A.  At 7, and I had no set hour to leave.  Until they let us go

21  home.

22  Q.  And about when did they let you go home?

23  A.  5:30, 6, 7.

24  Q.  You said that you were fired in March of 2010?

25  A.  Yes.

1    Q.   What happened?

2    A.   I worked my regular week and it was only when I went on

3    Friday to Mr. Cho that he was paying, he called me into his

4    office and then he handed me out my check, I mean my money, and

5    then he gave me a letter that said letter of termination and he

6    told me this is your last day of work.

7    Q.   Had he ever told you that there was a problem with your

8    work such that you might be fired before that?

9    A.   No.  Never.

10   Q.   Do you know when the complaint in this lawsuit was filed?

11   A.   In February of 2010.

12   Q.   And did you hear anything at work that would make you think

13   that Mr. Cho knew that you had participated in that complaint?

14   A.   Yes.

15   Q.   What was that?

16   A.   First I became aware that he got the notification on a

17   Thursday, and next Monday, at the beginning of the week, he

18   asked us to start punching with a clock.

19   Q.   And can you compare what you were paid after you started

20   punching with a clock and before?

21   A.   Yes.  I worked the same amount of hours I used to work

22   regularly, but my weekly pay was $40 less.

23   Q.   What else happened at work at that point?

24   A.   Well, next week there was a complaint by a customer of his

25   with respect to my helper due to security reasons, and I was

1    not involved in the controversy that took place at that point

2    in time, but Mr. Cho said that I was the reason of the problem.

3    Q.  Had there been issues with customers before in the time you

4    had worked for Mr. Cho?

5    A.  No.

6    Q.  After you were fired, how did that make you feel?

7    A.  Well, first concerned and a bit scared because I didn't

8    have any other source of money.  My first concern was my mother

9    in Mexico because I wasn't able to send her any, because I used

10   to send her weekly.  And not being able to do that was my first

11   concern.

12          In the second place, and my second concern, was my

13   expenses, my rent, my bills, all I had to pay for.  I had a bit

14   of savings and that's what I lived on for a couple of months,

15   but afterwards my money ends and then I had to ask for a loan

16   in order to be able to pay my rent and some bills I had.  And

17   that led me to depression because I was desperate.  I wasn't

18   able to find any work.  I was depressed.  I was stressed the

19   whole time.  Sometimes I was unable to sleep.  And then, well,

20   more than anything, in the end I was able to find a job in

21   September and, thank God, that's what's helped me to get out of

22   my depression and to go forward.

23   Q.  Can you tell me more about how it affected you being

24   depressed.  What did that feel like?

25   A.  More than anything I was feeling very stressed.  Many

1    things I had in my mind.  I had a lot of problems.  I wasn't

2    able to sleep.  I lost a lot of weight, so that even my

3    relatives kept asking me whether I was sick because I lost a

4    lot of weight.  And that's what it was like throughout that

5    time.  That's how I was.  I wasn't even able to get out of bed.

6    I was feeling very sad and very desperate.

7    Q.  One more question.  Was the name of Mr. Cho's company the

8    same the whole time you worked there?

9    A.  No.  The second week of February the management of the

10   company asked us to change the plates in the trucks, and then

11   afterwards I realized that the name in the registration was

12   also changed and it had a new name, from SMC Beverage Plus to

13   Graham Beverage Corporation.  And the insurance used to be in

14   the name of the company, but it changed to the name of Joseph

15   Kim.

16   Q.  When were those changes in relationship to when the

17   complaint in this case was filed?

18   A.  Two weeks after he was handed the notification of the

19   lawsuit.

20           THE COURT:  Do you want to identify who "he" is.  Just

21   for the record, "he" meaning?

22           THE WITNESS:  Mr. Cho, the one to the left.

23           THE COURT:  Who is?

24           THE WITNESS:  He is the owner of the company.

25   Q.  That is Yun S. Cho?

1  A.  Yun S. Cho.

2            THE COURT:  That's all right.

3            Anything else?

4            MS. GOODELL:  We have nothing further.

5            THE COURT:  I have a question before I give the

6  defendants a chance.

7            When you started in 2004, how many employees were

8  there?

9            THE WITNESS:  There were five.

10            THE COURT:  That includes you?

11            THE WITNESS:  Yes.  A month after he employed more

12  people.  And from that point on until I left he had seven

13  people, in between seven and nine people.  No less than seven

14  the whole time.

15            THE COURT:  By the end of 2004, the number had gone

16  up?

17            THE WITNESS:  No.  It was over the winter.  I would

18  say that by March he already had more people.

19            THE COURT:  OK.  Any questions from the defendant?

20            MR. YUN S. CHO:  Yes, your Honor.

21  CROSS EXAMINATION

22  BY MR. YUN S. CHO:

23  Q.  You said you started working in September 15, '04, 2004

24  until --

25            THE INTERPRETER:  Excuse me.

1C8HMERH                     Merino - cross

1   Q.  -- March 12, 2010.

2              THE INTERPRETER:  Your Honor.

3              THE COURT:  I know.  This can be more difficult.

4        Wait until we are clear that he is finished with his

5   question.

6              MR. YUN S. CHO:  I want to make simple question, your

7   Honor.

8   Q.  Are you sure you start September '04 until I let you go in

9   March 2010?

10  A.  Well, to be sure, I never gave an exact date.  Never.  I

11  only said around September 2004 until I was fired in March in

12  2010.

13             MR. YUN S. CHO:  Your Honor, on my record, October

14  2006 he left the company without any notice.  He left company

15  for about two months.  He moved to another state, and he

16  couldn't stay there and asked for me his job again two months

17  later.  He does not even remember this, sir.

18             THE COURT:  So you are saying that he was off for two

19  months.  Is this in dispute, by the way?

20             MS. GOODELL:  I believe the amount of time is somewhat

21  in dispute.  He only testified as to his first and last date

22  there, so I don't think there is any contradiction.

23             MR. YUN S. CHO:  I am trying to say, your Honor, his

24  testimony is based on not certain memories.  He said he worked

25  whole year, but he doesn't remember how many months he didn't

 1   work.  He left company.  And also on his statements there is

 2   one accident, cause me a lot of money, a year later.  He

 3   doesn't remember, said he doesn't remember.  Obviously I have

 4   some record of accident, but he says he doesn't remember.

 5           THE COURT:  Let me ask you this.  Are there any

 6   factual issues you want to ask him about?  You can make

 7   arguments to me, but since he is on the stand and sworn, what

 8   facts do you want to get from him?

 9           MR. YUN S. CHO:  He stated that I have employed more

10   than 100 people over the years.  I don't know how he can know

11   that I have that many people.

12           THE COURT:  If you want to ask him some specific

13   questions, you can ask him specific questions.

14   Q.  How do you know I have employed more than 100 people over

15   the years?

16   A.  First, what I said that I remember, that he has employed

17   about 100 people, about 100 people, and the reason being

18   because the work is hard.  There were even people who only

19   lasted two days there because the work is hard.

20           THE COURT:  Before we get too far afield on this, it

21   is not my understanding that the plaintiffs' calculations are

22   based just on the estimates that Mr. Merino made.

23           MR. YUN S. CHO:  That is what I am trying to say, your

24   Honor.

25           THE COURT:  I understand.  But the calculations that

1    you did, counsel, based on what records you had or estimates,

2    it is based on -- tell me what it is based on.

3              MS. GOODELL:  Your Honor, for the class it is based on

4    the total number of workers at any given time.  The question of

5    how many workers there were total, in other words, the

6    turnover, was an issue of numerosity that has already been

7    decided on class certification.

8              THE COURT:  So we don't know how many class members

9    there are.

10             MS. GOODELL:  The estimates are over 60.  The

11   estimates are over 60.

12             THE COURT:  Based on?

13             MS. GOODELL:  That is just based on the turnover.  In

14   other words, for a total of approximately eight workers at any

15   given time.  But since there is turnover, the total number of

16   people who have worked there during the limitations period in

17   the past six years before the complaint was filed would be over

18   60.

19             THE COURT:  I understand, but your calculation was

20   based on what the number for your class calculation.

21             MS. GOODELL:  It is based on the number of people

22   there at any one time.

23             THE COURT:  What is the number that you used?  Did you

24   use 60?

25             MR. MICHELS:  We assumed that there were six workers

 1   there plus two more workers during the summer.

 2           THE COURT:  OK.  So it doesn't really matter what the

 3   turnover is the way your calculation is done.  You are just

 4   assuming if there are six to eight it doesn't matter whether it

 5   is new people, old people, it is just that over the course of

 6   time --

 7           MS. GOODELL:  That is correct, your Honor.

 8           MR. MICHELS:  That is correct.

 9           MS. GOODELL:  Mr. Cho is referring to Mr. Merino's

10   affidavit which was done in support of numerosity.

11           THE INTERPRETER:  I'm sorry, your Honor.  The

12   interpreter cannot hear.

13           MS. GOODELL:  The estimate that Mr. Cho is referring

14   to is for numerosity and class certification and that has

15   already been decided.

16           THE COURT:  Mr. Cho, I know you are not an attorney,

17   but the affidavit that Mr. Merino did was to determine whether

18   or not there were enough class members to make a class.  So

19   even if the estimate was off -- he said 100 -- the law is

20   typically if you have 40 or more, that is enough for a class.

21   So even if he said 60 or 40 or 50, his guess, that would have

22   probably been enough for them to get the class.

23           MR. YUN S. CHO:  That is what I am trying to say, your

24   Honor.  Over the years so many people work a long time in spite

25   of Mr. Merino said it's hard work.

1          THE COURT:  You are not listening to me, Mr. Cho.  The

2     bottom line is regardless of what the number is, the

3     calculations that counsel did do not depend on the total number

4     of workers.  What was important was the average number of

5     workers.  It is not a question of whether or not there were 100

6     or 80 or 60.  The issue was whether or not there were about six

7     to eight at any given time.  So unless you have some evidence

8     to refute that the number of employees was approximately six to

9     eight during the period of time covered by the damages.

10          MR. YUN S. CHO:  Yes, sir.  As I mentioned before,

11     when I started business it was first low.  I mentioned before,

12     I had four people, five people, for two years.  I had only two

13     trucks.

14          THE COURT:  What period are you talking about?

15          MR. YUN S. CHO:  2004 and 2005.

16          THE COURT:  And Mr. Merino says that it was five when

17     he started and then it went up in about March of the next

18     year.  You can ask him about that.

19          MR. YUN S. CHO:  It was four people, your Honor.  I

20     don't know why he is saying five.  He is kind of exaggerating

21     all the facts.

22          THE COURT:  Well, that is his testimony.

23          MR. YUN S. CHO:  I have one more question, your Honor.

24     On his statement he said when he was fired he gets $490 per

25     week, which is less than $40 from previous week.

1C8HMERH                       Merino - cross

1  Q.  Do you know why you get that amount?

2  A.  Well, he was supposed to pay per hour.

3            MR. YUN S. CHO:  As I mentioned before, your Honor,

4  the wintertime is very slow.  If he wants I pay him an hour, I

5  have to give him a lot less.

6            THE COURT:  The question you are addressing now is why

7  he would have --

8            MR. YUN S. CHO:  He doesn't even know.

9            THE COURT:  Mr. Cho.  The question you are addressing

10  now is why he got $490 when he was terminated?

11            MR. YUN S. CHO:  Yes, your Honor.

12            I want to point out, the money he gets is fixed amount

13  or by the hour.  He doesn't really understand.  He was same

14  amount all the time.

15            THE COURT:  You should understand how, Mr. Cho, much

16  of that testimony went to the question of retaliation and the

17  retaliation, the major part of the retaliation, has to do with

18  whether or not the termination was a result of him exercising

19  his rights.  Even if the 490 had a good explanation, that would

20  not get to the heart of it being retaliation.

21            MR. YUN S. CHO:  No, your Honor, it wasn't

22  retaliation.

23            THE COURT:  So in order to challenge the retaliation,

24  you can demonstrate or present evidence that he was not

25  terminated because he exercised his rights to complain about

1    discrimination.

2             MR. YUN S. CHO:  Your Honor, we have been through this

3    before with Rakoff, Judge Rakoff.  The plaintiff answered

4    motion about retaliation, but we won the case because by that

5    time coincidentally he was acting out.

6             THE COURT:  I'm sorry.  Are you saying that Judge

7    Rakoff ruled there was no retaliation?

8             MR. YUN S. CHO:  No, your Honor.  You should have

9    court records.

10            THE COURT:  I am not sure what you are referring to.

11            MS. GOODELL:  He is referring to the preliminary

12   injunction hearing, your Honor, where Judge Rakoff denied a

13   preliminary injunction, reinstating Mr. Merino on the basis

14   that he didn't think that there was a probability of success on

15   that claim.  That ruling obviously is no longer effective.

16   What is effective is defendants' default on this issue on

17   liability.

18            THE COURT:  OK.  Did you have a hearing before Judge

19   Rakoff?

20            MS. GOODELL:  Yes, your Honor.

21            THE COURT:  And then the default occurred, and there

22   was no determination other than the default concerning either

23   the liability or the retaliation.

24            MS. GOODELL:  That is correct, your Honor.  The

25   determination was just for the preliminary injunction only.

1          THE COURT:  Do you understand -- you probably don't,

2    Mr. Cho -- that when you defaulted --

3          MR. YUN S. CHO:  Yes, sir.

4          THE COURT:  -- on the underlying claim, then the

5    question of whether or not the plaintiff would prevail on a

6    claim of discrimination and retaliation was taken off the table

7    because you defaulted on those claims.  So the plaintiffs have

8    a default on the issues that they raised, including

9    discrimination and retaliation.  So even though Judge Rakoff

10   may have made some statements with regard to preliminary

11   injunction concerning what he thought was the likelihood of

12   success, that is not a final determination of success.  So he

13   never determined that there was no retaliation.

14         MR. YUN S. CHO:  I understand, your Honor.

15         THE COURT:  Is there anything else?

16         MR. YUN S. CHO:  No, nothing further, your Honor.

17         MS. GOODELL:  We have nothing further, your Honor.

18         THE COURT:  You may step down, Mr. Merino.

19         (Witness excused)

20         THE COURT:  Mr. Cho.

21         MR. YUN S. CHO:  Yes, sir.

22         THE COURT:  Normally I am talking to *pro se*

23   plaintiffs, but since you are a defendant and acting *pro se*, do

24   you understand the issues that are going to be considered by

25   me?  I am going to be considering damages, not liability.

1           MR. YUN S. CHO:  Yes, your Honor.

2           THE COURT:  You have seen what the plaintiffs did in

3     their calculation.  They did a calculation assuming the number

4     of employees that would be there at any given time and the

5     number of hours that those employees would work on a weekly

6     basis.  To the extent that you have any evidence objectively on

7     those issues, you should have responded to their motion.

8     Because you are a layperson, I am not sure that you quite

9     understood that.  But do you understand what it is that you

10    would have to address?

11          MR. YUN S. CHO:  I think I do, your Honor.

12          THE COURT:  Since they did a global calculation,

13    unless you have something which is going to address either the

14    number of hours worked or the number of employees, it is

15    probably not going to affect the calculation that they did.

16          MR. YUN S. CHO:  My question, your Honor, is their

17    rate.  I don't know how they can produce that rate per hour.

18    It is not like plaintiffs' counsel can set the rate how much I

19    suppose to pay to my workers.

20          THE COURT:  OK.  In the absence of actual numbers what

21    the plaintiff does is reconstruct what the rate would be based

22    upon the hours worked, and that is the way it is done.

23    Obviously if you are the employer and you don't structure it

24    correctly, then somebody has to come up with some way of

25    determining what the effective hourly rate was, and that is

1    what the plaintiffs are attempting to do.  Because you have

2    paid a fixed rate, in order to do calculations under the

3    statute you have to figure out what the effective hourly rate

4    was.

5            So given the fact that you are a layperson, Mr. Cho,

6    and since I have identified for you what it is that forms the

7    basis of the plaintiffs' calculations, and you have been here

8    today and you have heard the testimony, if you have any

9    evidence or any arguments that you wish to make on those

10   issues, I will give you an additional two weeks to make those

11   arguments.

12           MR. YUN S. CHO:  Yes, your Honor.

13           THE COURT:  That is, what the hours were worked and

14   how many employees there were, and if you have anything on the

15   damages that are claimed for Mr. Merino, which include

16   compensatory damages.  I am not sure you understand what

17   compensatory damages are.

18           With a finding of discrimination by retaliation,

19   Mr. Merino is entitled to damages for that.  You can challenge

20   the amount of damages and say that he is not entitled to that

21   amount for whatever reason you think is appropriate.

22           Anything else before we adjourn?

23           MR. MICHELS:  Yes, your Honor.  Is there a date that

24   the court would like us to submit our fee application?

25           THE COURT:  Do you think that you will be filing a

1    response to his submission?

2              MR. MICHELS:  I am sure that we will.

3              MR. YUN S. CHO:  Could I have one month instead of two

4    weeks, your Honor?

5              THE COURT:  I will give you until the end of the year.

6              MR. YUN S. CHO:  Thank you, your Honor.

7              THE COURT:  January 15th.  I'm sorry.  January 17th.

8              MR. MICHELS:  The other issue, your Honor, is that we

9    have been serving defendants by e-mail and by certified mail to

10   the last address that we have, but we have been getting a lot

11   of mail returned to us as unaccepted.  So if there is another

12   address that the defendants can provide us with so we can

13   properly serve them.

14             THE COURT:  Mr. Cho, you are directed to give the

15   plaintiffs an address at which you can be served.

16             MR. YUN S. CHO:  The address they have is right, sir.

17   The thing is I am not there all the time.

18             THE COURT:  If you are not there, it gets returned?

19             MR. YUN S. CHO:  No, your Honor.  Sometimes the

20   receipt is missing.  Sometimes I get, sometimes I don't.

21             THE COURT:  Which address is it that you say is the

22   correct address.

23             MR. YUN S. CHO:  58-87 55th Street, Maspeth, New York

24   11378.

25             THE COURT:  If the plaintiffs send to that address, we

1C8HMERH                          Merino – cross

1    will assume they have served you.

2            He says that is the correct address.  I don't know why

3    it is coming back, but he said it on the record.  If you can

4    demonstrate that you served at that address, that to me will

5    suffice.

6            MR. MICHELS:  Thank you, your Honor.

7            THE COURT:  For now I think we will adjourn.  We will

8    get your brief, Mr. Cho.  As a *pro se*, I do want you to have

9    every opportunity to understand what it is you need to address.

10   If you have any questions, this is a good time to ask them.

11           MR. YUN S. CHO:  No, your Honor.

12           THE COURT:  Do you know what you need to do?

13           MR. YUN S. CHO:  Yes.

14           THE COURT:  We will be adjourned.

15           As to the notice issue, it does seem to me that to the

16   extent we are talking about notice to the class it probably

17   ought to wait until Judge Rakoff has signed off on this.

18           MS. GOODELL:  Yes, your Honor.  In fact, I believe

19   that our proposal is that we provide the notice after the

20   judgment has been paid so that we have something to pay the

21   people.

22           THE COURT:  All right.  To be continued.

23           Thank you.

24           (Adjourned)

25

1                          INDEX OF EXAMINATION

2    Examination of:                                    Page

3    Direct By Ms. Goodell  . . . . . . . . . . . .28

4    Cross By Mr. Yun S. Cho  . . . . . . . . . . .32

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25